UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE H. BAILEY,

              Plaintiff,

                                    Case No. 15-11799

v.

                                    Paul D. Borman

OAKWOOD HEALTHCARE, INC.            United States District Judge
d/b/a OAKWOOD HOSPITAL &
MEDICAL CENTER,

              Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is a workplace discrimination lawsuit filed by Plaintiff Michelle H. Bailey against Defendant Oakwood Healthcare, Inc., which employed Plaintiff as a human resources professional in 2013 and 2014. Plaintiff began working for Defendant in April 2013, went on maternity leave in December 2013, and returned in March 2014 only to be fired the same day. Plaintiff alleges that she suffered discrimination on the basis of her race, her pregnancy, and her age. She also claims that she was fired in retaliation for opposing acts of racial discrimination committed by her supervisor and her department as a whole.

Before the Court is Defendant's Motion for Summary Judgment. As discussed in detail below, Plaintiff has put forward enough evidence to raise

genuine issues of material fact on some of her claims at the *prima facie* stage, but she cannot ultimately demonstrate that the reasons proffered by Defendant for her termination were pretextual. For that reason, the Court will grant Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    Plaintiff's Background and Hiring by Defendant

Plaintiff is an African-American woman. (ECF No. 13, Am. Compl. ¶ 5; ECF No. 38, Def.'s Mot. Ex. 4, Deposition of Michelle Bailey 26:2-3.) She holds a Bachelor's Degree in Organizational Administration, as well as a Graduate Certificate in Human Resources, from Central Michigan University. (Bailey Dep. 165:18-166:2, 167:25-168:2, 168:18-169:18.) At all relevant times she was either 40 or 41 years old. (Def.'s Mot. Ex. 17 at 2, Pg ID 838; Bailey Dep. 73:22-23.)

For nearly 23 years prior to her employment with Defendant, Plaintiff worked for Beaumont Hospital ("**Beaumont**").[1] (Bailey Dep. 91:9-11.) Plaintiff began at Beaumont as a transporter, and held a variety of positions during her tenure there until she accepted the position of "HR Administrative Special Support

---

[1] By the time she submitted a successful job application to Defendant, plaintiff was officially an employee of Accellion, which had assumed control of Plaintiff's department by virtue of either a merger or an acquisition. (Bailey Dep. 90:5-16, 214:23-215:9.) For clarity's sake, this Opinion and Order refers to Plaintiff's employer before she worked for Defendant as "Beaumont."

and Projects" in 2011. (Bailey Dep. 90:17-20, 91:12-13, 100:23-101:5.)

Plaintiff submitted job applications to Defendant on two separate occasions while she worked for Beaumont: first for the position of Senior Compensation Professional in 2011, and then for the position of Senior Staffing Professional in 2013. (Def.'s Mot. Ex. 3, 2013 Application; Def.'s Mot. Ex. 26, 2011 Application.) Plaintiff was invited to interview based on the 2013 application, and she interviewed with human resources manager Pandora Walker, among others. (ECF No. 41, Pl.'s Resp. Ex. D, Deposition of Pandora Walker at 224:21-225-2, 253:8-14.) Plaintiff testified that in at least one of the interviews, she told her interviewers that the work history dates on her application could be inaccurate, as she did not have all of the relevant records on hand when she filled it out. (Bailey Dep. 134:11-20.) Plaintiff also testified that she assumed that the background check that would be performed prior to her being hired by Defendant would catch any significant issues or discrepancies, including differences between her 2011 and 2013 applications. (Bailey Dep. 134:23-135:10.) Lastly, Plaintiff testified that no one raised an issue with her about any discrepancies between the resumes after the background check was conducted. (Bailey Dep. 181:11-14.)

2.     **Plaintiff's Employment with Defendant: April 2013 to December 2013**

Plaintiff began working for Defendant as a Senior Staffing Professional on

April 15, 2013. (Bailey Dep. 11:24-12:1; Walker Dep. 74:4-5.) The responsibilities of this position included recruitment and interviewing of prospective employees, evaluation of candidates for various positions, participation in job fairs and college recruitment efforts, and providing various forms of support to hiring managers as well as Defendant's Human Resources Director. (Def.'s Mot. Ex. 2, Senior Staffing Professional Job Description.) The group in which Plaintiff worked was responsible for approximately 5000 employees overall, within which there were, on average, 180 open positions at any given time. (Walker Dep. 78:14-81:15.)

Pandora Walker was Plaintiff's direct superior, as well as the only employee in the department besides Plaintiff who engaged in recruiting. (Walker Dep. 35:7-17; Bailey Dep. 22:1-9, 183:13-14.) Walker, in turn, reported to Director of Human Resources David Squire, and she also reported to Human Resources Administrator Sherry Huffman. (Bailey Dep. 23:19-24, 24:5-14; Walker Dep. 21:1-9, 34:11-18.) Walker is African-American. (Walker Dep. 49:5-6.)

Another employee in the department, Andrea Hale, held the position of Human Resources Representative, and worked just outside of Plaintiff's office. (Bailey Dep. 25:2-7, 69:16-18.) Hale is Caucasian, and Plaintiff testified that she was "very young" at the time relevant to this lawsuit.[2] (Bailey Dep. 71:25-72:3.)

---

[2] Plaintiff states that Hale's date of birth was not revealed during discovery, but estimates based on the date that Hale received her undergraduate degree that Hale

4

Plaintiff testified that Walker "often" referred to Hale in conversations with Plaintiff as a "young whippersnapper."[3] (Bailey Dep. 79:24-80:1.) In Plaintiff's words, Walker told her "several times that Andrea interviewed for my job, that she wanted my job, and that she was a potential replacement." (Bailey Dep. 70:3-11.) In her own deposition testimony, Walker denied having said that Plaintiff would be replaced by Hale, that Hale should work in a position similar to Plaintiff's, or that Plaintiff would be fired so that Hale could take her job. (Walker Dep. 368:1-21.)

Plaintiff testified that at some point during the summer of 2013, she began to make complaints to Walker regarding Walker's interacting with African-American employees differently than she did with Caucasian employees, and also regarding what Plaintiff perceived to be discriminatory hiring policies employed by the human resources department. (Bailey Dep. 12:7-17:9.)

Plaintiff and Walker met on August 15, 2013. (Walker Dep. 134:19-23, 141:14-25.) At that meeting, they discussed the performance review that been made for Plaintiff after the end of her 60-day probationary employment period.[4]

___

would have been between 24 and 26 during the relevant time period. (*See* Pl.'s Resp at 30 n.12, Pg ID 1010.)

[3] The Merriam-Webster Dictionary defines this term as "a diminutive, insignificant, or presumptuous person." Whippersnapper Definition, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/whippersnapper (last visited August 21, 2017). Thus, this is not a complimentary term.

[4] That performance review shows largely positive ratings for Plaintiff's probationary period: she received consistent marks of 2 out of 3 (a rating described as "Exhibits this behavior (Solid Performer)") in three of the 13 categories: "Uses

(Walker Dep. 118:2-12; Pl.'s Resp. Ex. F, EEOC Position Paper at 3, Pg ID 1171; Pl.'s Resp. Ex. J, Performance Review.) It was at this meeting that Plaintiff announced her pregnancy. (Bailey Dep. 73:9-17; Walker Dep. 118:2-12.) At the same meeting, Walker observed that Plaintiff had been coming in late to work, and agreed to adjust Plaintiff's start time from 8:00 AM to 8:30 AM. (Bailey Dep. 75:23-76:10, 77:6-8; Walker Dep. 121:17-24.)

Plaintiff asserts that after she announced her pregnancy, Walker began to make offensive remarks on the topic. Specifically, Plaintiff testified that Walker told her that she was too old to be having a baby, and that because of this, there would be greater risks of pregnancy complications or that her child would have Down syndrome. (Bailey Dep. 22:24-23:4.) Plaintiff further testified that on several occasions, Walker characterized Plaintiff as having "pregnancy brain" after Plaintiff made a minor mistake. (Bailey Dep. 73:9-74:20.) Plaintiff testified that she complained about these remarks to Walker directly. (Bailey Dep. 23:5-6, 74:21-25.) Plaintiff also testified that after she announced her pregnancy, her

---

resources wisely and effectively," "Follows Hospital/Department Policies and Procedures," and "Attends Work as Scheduled." For all other categories she received consistent marks of 3 out of 3. The "Comments" section describes Plaintiff as "a great addition to our team" but also states that "[s]he should pay more attention to detail to ensure her work is accurate and positions are filled correctly." (Pl.'s Resp. Ex. J, Performance Review at 2, Pg ID 1205.) The second page of the review states "MICHELLE IS A GREAT ADDITION TO THE HR TEAM. SHE IS ALWAYS PROFESSIONAL AND CONTINUES TO BECOME PROFECIENT [sic] IN HER NEW ROLE." (*Id.* at 3, Pg ID 1206.)

workload began to increase substantially, though she also testified that she did not know how much her workload increased compared to that of Walker, whom she acknowledged was the only other employee in her department that was engaged in recruiting. (Bailey Dep. 18:10-16; 22:1-17.)

At some point thereafter, Walker rejected an African-American candidate that Plaintiff had submitted to her for an open dietary position because he lacked an associate's degree. Plaintiff pointed out to Walker that the position as advertised only required a degree "or equivalent experience." Walker later identified Plaintiff's recommendation of this candidate as one of Plaintiff's mistakes that was discovered when she was away on maternity leave. (Bailey Dep. 83:6-84:6.)

In September 2013, Plaintiff's start time was changed from 8:30 AM back to 8:00 AM. (Bailey Dep. 76:22-77:8.) The parties agree on this, but dispute whether it was Plaintiff's decision. (Bailey Dep. 76:19-77:5; Walker Dep. 127:9-128:12.)

Plaintiff also testified that she was denied the opportunity to work from home, while one or more other employees—including at least one Caucasian employee, as well as Walker herself—were allowed to do so. Specifically, Plaintiff testified that she called in one day and informed Walker that she would need to work at home that day because her son was sick. The next day, Walker approached Plaintiff and informed her that she should not in fact have been working from home, since defendant did not have a work-from-home policy. Plaintiff testified

that Walker herself "often" worked from home, and that she had heard from two other employees (including Hale) that a Human Resources representative, who was Caucasian and who worked in a different department, had been allowed to work from home "[f]or a long period" while she was pregnant. Plaintiff did not recall this employee's name. (Bailey Dep. 18:3-21:25.) Plaintiff testified that she was not aware of any policy of Defendant's that allowed employees to work from home on a regular basis. (Bailey Dep. 41:4-9.) Walker testified that employees in the Human Resources Department were not allowed to work from home, that Walker herself had used paid leave whenever she was out of the office, and that besides the incident described above involving Plaintiff's son, Plaintiff never made a request to work from home. (Walker Dep. 386:21-387:21.)

Plaintiff testified about several other incidents in which she complained to Walker about what she believed to be racially discriminatory conduct committed by Walker in her capacity as a human resources manager. Plaintiff's testimony regarding these incidents can be summarized as follows:

- ***Michael.*** In or around October 2013, Plaintiff became aware of the interview of an applicant named "Michael," which was held by a manager of a different department (after the Human Resources department had screened the applicant). The interview was attended not only by the manager but also by another employee of the same department. This was contrary to normal practice. According to a second hiring manager who was not present at the interview, the other employee who was at the interview said that the

applicant had given an inappropriate response to a question. The applicant denied to Plaintiff that he had made this response. Plaintiff raised the issue with Walker, who had discretion to recommend a private interview for the applicant, but Walker did not think this was necessary. (Bailey Dep. 44:14-51:3, 188:17-189:8.)

- ***Ms. Poole.*** In or around October 2013, Walker remarked to Plaintiff that an African-American female applicant named Poole was wearing "men's clothes," and that because she was wearing sunglasses she looked like a drug user. (Bailey Dep. 189:14-190:9.) After Ms. Poole's background check came back positive with a criminal history, Ms. Poole explained that she had been unaware that the flagged incidents were on her record, and therefore did not knowingly falsify her resume. She also wrote a letter to Walker detailing the situation, and submitted letters from her mother and her pastor. Despite having an "in-depth discussion" at some point with Ms. Poole, Walker was unpersuaded. (Bailey Dep. 202:20-203:11) Plaintiff protested that this was unfair and that Caucasian applicants had been given the chance to explain apparent falsifications in their resumes. (Bailey Dep. 26:17-30:2.) Walker nevertheless rescinded Ms. Poole's job offer, a decision which Plaintiff opposed. (Bailey Dep. 36:15-17, 60:24-61:5; *see also* Bailey Dep. 14:6-17:1, 32:10-36:14, 56:3-57:17, 60:23-61:5, 189:9-192:5, 194:20-195:23.)

- ***Ms. Bentley.*** In or around October 2013, an African-American female applicant named Bentley was hired as a Dietary Assistant. After seeing Ms. Bentley's photograph, Walker stated that Huffman wished to know who had hired her, and remarked that "we don't hire people who look like this." (Bailey Dep. 35:15-24.) Walker directed Hale to run a background check, which returned a past conviction for "open intoxicants." (Bailey Dep. 13:8-14:1, 191:23-192:1.) Ms. Bentley explained that she had forgotten about the

conviction and it had never turned up in employment background screenings before. (Bailey Dep. 59:18-60:2.) (Plaintiff characterized the conviction at different times in her deposition testimony as 20 years old and 30 years old. (Bailey Dep. 13:11-23, 57:18-22.)) After Plaintiff related Ms. Bentley's response to Walker, Walker directed Plaintiff to rescind her job offer. (Bailey Dep. 36:7-14.) Plaintiff made her opposition to this decision clear to Walker, as well as her opinion that the decision was discriminatory, and initially refused to carry out the order for several days before acquiescing. (Bailey Dep. 59:18-62:7; *see also* Bailey Dep. 33:24-34:5, 191:23-194:19.)

- ***Unidentified Nursing Assistant.*** In or around November 2013, Plaintiff became aware of a discrepancy in treatment between two new employees—one African-American and one Caucasian—who had been hired around the same time. The African-American new hire, a nursing assistant, was not permitted by Walker to attend her orientation program until she produced her professional certification documents, which Plaintiff had confirmed with the applicant's school had been sent by mail. By contrast, the Caucasian applicant hired for a lab support position was allowed to attend his orientation immediately, despite a delay in the verification of his high school diploma. Plaintiff pointed out this discrepancy and suggested that it was discriminatory, but Walker ignored the question and took no action. (Bailey Dep. 53:15-56:2, 184:23-188:16.)

For her part, Walker testified that at no point during Plaintiff's employment did she tell Plaintiff to rescind a job offer, since that was not something that Walker had the authority to do. (Walker Dep. 374:22-375:2.) Walker also testified that she and Plaintiff never discussed the topic of race (Walker Dep. 217:2-4), and

that at no point did she ever make remarks regarding Plaintiff's age—in general or as it related to Plaintiff's pregnancy (Walker Dep. 117: 2-9, 118:13-16).

### 3. Plaintiff's Leave Period and Termination: December 2013 to March 2014

On December 4, Walker called Plaintiff into her office and confronted her about what Walker stated were continuing punctuality issues on Plaintiff's part. Frustrated at this, at least in part because she felt it was unfair given her advanced pregnancy, Plaintiff moved up a doctor's appointment that had originally been scheduled for the following week to the next day. (Def.'s Mot. Ex. 13, 12/4/13 E-Mail at 3, Pg ID 827.) The day of that appointment, December 5, was the day that Plaintiff began her maternity leave. (Bailey Dep. 76:22-77:3; Walker Dep. 74:2-10.) Plaintiff first provided Defendant with a note from her doctor stating that she needed two weeks off due to "pregnancy complications." (Def.'s Mot. Ex. 21, Medical Note.) She later provided a certification to justify leave for the remainder of her pregnancy. (Def.'s Mot. Ex. 22, Certification of Health Care Provider.)

For approximately one month during her leave period from Defendant, Plaintiff worked for International Staffing Consultants ("**ISC**"), performing staff recruiting and placement. Compensation from ISC was predicated on her making a job placement. She was not paid a salary. She did not succeed at this employ in making a placement. (Bailey Dep. 145:4-146:6.) Defendant's Leave of Absence

Policy provides that "[e]mployees may not engage in any gainful employment or occupation during a leave of absence." (Def.'s Mot. Ex. 18, Leave of Absence Policy at 20, Pg ID 860.) Plaintiff testified that she was not aware of this prohibition. (Bailey Dep. 145:25-146:3.)

Walker testified that at some point during Plaintiff's leave period, she discovered Plaintiff's prior unsuccessful job application to Oakwood from 2011, and noticed differences between that work history, and that same work history as presented on Plaintiff's successful 2013 application. (Walker Dep. 147:19-150:22.)

Plaintiff returned to work on March 20, 2014; her employment was terminated that day. (Bailey Dep. 67:15-17.) The termination occurred at a meeting between Plaintiff, Walker, and Squire, which lasted approximately 30 minutes. (Bailey Dep. 146:21-147:6; Walker Dep. 154:18-155:9.) Plaintiff testified that Squire started the meeting by informing Plaintiff that she was being terminated for poor performance, based upon mistakes that she had discovered during Plaintiff's maternity leave. (Bailey Dep. 86:23-87:12.) Plaintiff was presented with a six-page document prepared during her leave period that summarized those performance issues. (Bailey Dep. 81:2-19; Walker Dep. 315:5-316:15; Pl.'s Resp. Ex. BB.) A separate, 28-page document summarizing Plaintiff's performance issues was also used at the meeting. (Walker Dep. 292:13-293:3; Bailey Dep. 197:6-199:23; Pl.'s Resp. Ex. AA.) Plaintiff gave inconsistent testimony as to whether she was allowed

to look at the pages of those documents at the meeting. (Bailey Dep. 82:18-25, 199:4-10.)

Plaintiff testified that at the March 20, 2017 meeting, she, Walker, and Squire discussed three of Plaintiff's mistakes that were listed on the six-page document, and that for each one, after Walker and Squire brought up the incident, Plaintiff provided an explanation. (Bailey Dep. 83:6-89:3.) The first was Plaintiff's submission (mentioned above) of a dietary position candidate who lacked a degree; to this Plaintiff responded that the job description called for a degree or equivalent experience, and that the manager who would oversee the position wanted that particular applicant. (Bailey Dep. 83:22-84:6.) The second was Plaintiff's submission of a candidate for a social worker position who was not fully licensed; Plaintiff's response was that the job description did not require a full license but merely that the candidate agree to obtain a full license within a particular time period. (Bailey Dep. 84:7-18.) The third was Plaintiff's submission of a candidate who "did not have a positive rehire status"; Plaintiff claimed not to have had access to the system that contained that negative information. (Bailey Dep. 84:19-86:22.)

Squire and Walker then confronted Plaintiff about differences that Walker had discovered between the work histories on Plaintiff's 2011 and 2013 job applications. (Bailey Dep. 87:13-16.) Squire presented Plaintiff with a chart

summarizing the differences between the two applications, which Plaintiff acknowledged in her deposition was accurate. (Bailey Dep. 118:11-16, 139:15-18.) The chart ("Re: Michelle Bailey – Application Differences") summarized the positions represented on Plaintiff's (ultimately unsuccessful) 2011 application for Senior Compensation Professional as follows: "1997 - 1999 AR Specialist," "1999 - 2001 Operations Leader – Communications," "2001 – 2008 Benefits Analyst," and "2008-2011 Supervisor – Homecare."[5] (Def.'s Mot. Ex. 27, Summary of Application Differences.) Next to this list, the chart summarized the positions represented on Plaintiff's (ultimately successful) 2013 application for Senior Staffing Professional as follows: "1993 – 1995 Lead AR Specialist," "1995 – 1999 Supervisor Communications," "1999 – 2006 Senior Benefits Analyst," "2006 – 2010 Business Operations Supervisor Homecare," and "2010 – 2013 HR Admin and Project Manager." (*Id.*) Plaintiff testified that Walker said at the meeting that the two applications made Plaintiff "look like two different people." (Bailey Dep. 89:17-24.)

Plaintiff was given the opportunity to resign in lieu of being terminated, after Squire explained that this would allow Plaintiff to collect unemployment benefits, and that it would look better on future job applications. (Bailey Dep. 115:10-22.)

---

[5] Directly beneath the final position on this list ("2008-2011 Supervisor – Homecare") are the words "Lay off." (Def.'s Mot. Ex. 27.) Plaintiff testified that at the time she filled out the 2011 application, "there was a fear of layoff because of a reorganization with Accellion." (Bailey Dep. 125:21-25.)

Plaintiff took the opportunity, and signed a resignation letter. (*See id.*; Def.'s Mot. Ex. 39, Michelle Bailey Resignation Letter.)

The parties dispute whether Hale took over Plaintiff's position. Plaintiff testified that she did. (Bailey Dep. 70:13-73-8.) Walker testified that Plaintiff was not replaced at all, because Defendant did not advertise Plaintiff's position as being open. (Walker Dep. 366:21-25.) Walker further testified that Hale was given a new position as a "Staffing Professional," since she did not have the requisite experience for Plaintiff's position of "Senior Staffing Specialist" (Walker Dep. 367:1-16, 373:10-24; Def.'s Mot. Ex 38, Hale Transfer Documents and Job Description.) The "Staffing Professional" job was advertised in February 2014. (Pl.'s Resp. Ex. O, Staffing Professional Job Description.) Hale applied for the position via a "Transfer Request" on March 4, 2014. (Pl.'s Resp. Ex. P, Hale Application.) Hale was transferred to the position effective March 30, 2014, 10 days after Plaintiff's termination. (Pl.'s Resp. Ex. Q, Hale Transfer Form.)

## B.    Procedural History

Plaintiff filed the initial Complaint on May 19, 2015. (ECF No. 1.) Later, pursuant to a Stipulated Order (ECF No. 12), she filed an Amended Complaint (ECF No. 13, Am. Compl.), now the operative complaint, which added an age discrimination claim. The Amended Complaint asserts three race discrimination claims: one pursuant to the Civil Rights Act, 42 U.S.C. § 1981 (Count I); one

pursuant to Title VII, 42 U.S.C. § 2000e *et seq*. (Count II); and one pursuant to the Elliott-Larsen Civil Rights Act ("**ELCRA**"), Mich. Comp. Laws § 37.2202 *et seq*. (Count VI). The Amended Complaint also asserts claims for pregnancy discrimination under Title VII and ELCRA (Counts V and VIII respectively), and one age discrimination claim under ELCRA (Count IX). Finally, the Amended Complaint asserts retaliation claims under § 1981, Title VII, and ELCRA (Counts III, IV, and VII respectively).

Defendant filed its Amended Motion for Summary Judgment on September 2, 2016. (ECF No. 38.) The motion was amended so as to comply with the Court's order striking Defendant's initial Motion for Summary Judgment for exceeding the Court's page limitation. (ECF No. 37.)

Plaintiff filed her Response to Defendant's Amended Motion for Summary Judgment on October 14, 2016 (ECF No. 41), and Defendant in turn filed its Reply on November 18, 2016 (ECF No. 49). At the same time, Defendant filed two motions to strike, each directed at one of the first two exhibits attached to Plaintiff's Response: first, Exhibit A, a set of notes on a conversation between Squire and Defendant's in-house counsel that Defendant asserted were privileged; and second, Exhibit B, an unsworn, 200-paragraph Declaration by the Plaintiff. (ECF Nos. 47, 48.) After a hearing on February 1, 2017, at what was originally scheduled to be a hearing on the instant Motion for Summary Judgment, the Court

instead dealt with and granted both of Defendant's motions to strike from consideration Exhibit A (conversation notes) and Exhibit B (Plaintiff's 200-paragraph unsworn Declaration) to Plaintiff's Response in its subsequent evaluation of the instant Motion for Summary Judgment. (ECF Nos. 56, 68.)

The Court subsequently conducted a hearing on the instant Motion for Summary Judgment on June 19, 2017, and is now prepared to rule on it.

## II.     LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.     DISCUSSION

### A.    Discrimination Claims (Counts I, II, V, VI, VIII, and IX)

Plaintiff asserts that she suffered discrimination based on her race, her pregnancy, and her age.[6] Plaintiff has pleaded a *prima facie* case, at least on her

---

[6] Although several of Plaintiff's factual allegations concern insensitive or offensive comments that have to do with one or more of the protected classes of which she is a member, Plaintiff makes clear in her Response to Defendant's Motion for Summary Judgment that she "has not pled a harassment case." (Pl.'s Resp. at 30, Pg ID 1010.) The Court will therefore analyze Plaintiff's claims through the standards applicable to general Title VII disparate treatment claims, rather than harassment or "hostile work environment" claims.

race and age discrimination claims, because each element of the applicable standard either is undisputed or entails a genuine fact question. Plaintiff cannot, however, show that the legitimate reasons proffered by Defendant for her termination are pretextual. The Court will therefore grant summary judgment to Defendant on Plaintiff's six discrimination claims.

### 1. Race Discrimination (Counts I, II, and VI)

Plaintiff's race discrimination claims are brought under Title VII (42 U.S.C. § 2000e *et seq.*), 42 U.S.C. § 1981, and Michigan's Elliott-Larsen Civil Rights Act (MCL § 37.2202 *et seq.*) ("**ELCRA**"). "Both Title VII of the Civil Rights Act and § 1981 follow identical methods" in terms of proving individual racial discrimination. *Rosser v. Pipe Fitters Local 392*, 12 F.3d 214 (6th Cir. 1993) (citing *Shah v. General Electric Co.*, 816 F.2d 264, 267 n.1 (6th Cir. 1987) and *Daniels v. Board of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986)). It is equally well established that "claims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII." *Dotson v. Norfolk S. R.R. Co.*, 52 F. App'x 655, 657 (6th Cir. 2002) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)). The Court will therefore analyze all three of Plaintiff's race discrimination claims under the standard that governs Title VII discrimination claims.

Title VII provides that it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims under Title VII fall into two categories: "single-motive claims, i.e., where an illegitimate reason motivated an employment decision, or mixed-motive claims, i.e., where both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). "Plaintiffs must give proper notice when bringing mixed-motive claims." *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) (citing *Hashem–Younes v. Danou Enters. Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009)). Plaintiff has not styled her discrimination claims as mixed-motive claims at any point, so the Court will analyze them as single-motive claims.

A Title VII plaintiff can prove a single-motive case through direct or circumstantial evidence. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003)). When a plaintiff uses circumstantial evidence—as Plaintiff does here—the court must apply the burden-shifting framework pioneered by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must first establish a *prima facie* case, which in the context of a race discrimination claim

means "she must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated, non-protected employees." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 589 (6th Cir. 2014). If the plaintiff does so, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Wheat*, 785 F.3d at 237 (quoting *McDonnell Douglas*, 411 U.S. at 802). "The plaintiff then is required to prove that the reasons proffered by the defendant were not its true reasons, but were mere pretexts for prohibited discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

Here, the first and second elements of the *prima facie* case are not in dispute. The central issue with respect to Plaintiff's race discrimination claims at the *prima facie* stage concerns the third element: whether she has made the requisite showing of evidence that she was "qualified for the position." The Sixth Circuit has made clear that this is an objective inquiry:

> The prima facie burden of showing that a plaintiff is qualified can . . . be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003) (en

banc).

Defendant argues that the differences between Plaintiff's 2011 and 2013 applications that were discovered by Walker show that Plaintiff was never qualified for her position to begin with, citing in particular the fact that Plaintiff had less than five years' experience in direct human resources recruiting, despite having represented twice in the course of her 2013 application that she met the qualifications for the position of Senior Staffing Professional. (*See* Def.'s Mot. Ex. 3; Bailey Dep. 142:13-18.)

Even though the question of a Title VII plaintiff's qualifications is an objective one, *Wexler* establishes that the analysis is not singularly focused on one factor. In this case, a reasonable jury could find that Plaintiff was qualified for the position of Senior Staffing Professional by the time she was working in that position, even if she did lack the years of experience called for in the job description. (*See* Def.'s Mot. Ex. 2.) In fact, the other two factors besides experience that were identified in *Wexler* weigh in Plaintiff's favor on this point: she had a bachelor's degree in Human Resources, which was one of the educational qualifications for the job, and a reasonable jury could find, given her mostly positive performance reviews after 60 days on the job, that she had "demonstrated possession of the required general skills." Plaintiff has raised a genuine issue of material fact on this question, and so she has met her burden on

the third element of the *prima facie* case.

Defendant does not appear to argue that Plaintiff fails to meet the fourth prong of the *prima facie* case for her race discrimination claims: that she was replaced by or treated differently than a similarly situated person outside of the protected class. Either way, Plaintiff has raised a jury question over whether Hale, who was Caucasian, "replaced" Plaintiff after she lost her job. A reasonable jury could infer from the evidence presented that she did—which is all Plaintiff must show at this stage—for two reasons. First, the factual timeline is not inconsistent with a conclusion that Hale replaced Plaintiff: the job that Hale transferred into was posted a few weeks before Plaintiff was terminated but while she was still on leave (Pl.'s Resp. Ex. O); Hale applied for it less than a week before Plaintiff was fired (Pl.'s Resp. Ex. P); and Hale was then given the job ten days after Plaintiff's termination (Pl.'s Resp. Ex. Q). Moreover, according to Plaintiff's testimony, Walker remarked that Hale had wanted and applied for Plaintiff's position, and that Hale was a potential replacement for Plaintiff. (Bailey Dep. 70:3-11.) Walker denied this in her own testimony, and plausibly explained why Hale could not have been a replacement for Plaintiff. (Walker Dep. 366:21-368:21.) But Plaintiff is entitled to the benefit of reasonable factual inferences at the summary judgment stage, and the Court cannot say that no reasonable jury could find that Plaintiff was replaced by a person outside of the protected class.

Plaintiff has thus made the initial showing required of her, and so the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for firing her. Testimony regarding the March 20, 2014 termination meeting shows that Defendant articulated two such reasons, and Defendant reiterates those reasons here. First, and predominantly, Defendant claims that Plaintiff was terminated because she had misrepresented her qualifications in her application, and asserts that termination for this reason was consistent with Defendant's standard practices. (*See* Def.'s Mot. at 22-23, Pg ID 668-69 (citing Def.'s Mot. Ex. 32).) Second, Walker testified that the decision was made both because of the misrepresentations and because of errors that Plaintiff had made on the job. (Walker Dep. 36:2-12.) Defendant has proffered Plaintiff's performance issues as an additional explanation for her termination, based on Walker's testimony regarding the termination decision, Plaintiff's testimony regarding the March 20, 2014 meeting,[7] and Defendant's argument that other employees in the Human Resources Department had been similarly terminated for unsatisfactory performance. (See Def.'s Mot. at 23, Pg ID 669 (citing Def.'s Mot. Exs. 33-34).)

---

[7] Plaintiff testified that in her recollection of the March 20, 2014 meeting, Walker told her that the reason for her termination was a series of on-the-job performance issues, rather than misrepresentation of her qualifications as reflected by discrepancies between her 2011 and 2013 job applications. (Bailey Dep. 87:1-15.) But Plaintiff also testified that the application discrepancies were discussed by both Walker and Squire at that same meeting (Bailey Dep. 87:16-21), so the Court cannot reasonably conclude based on Plaintiff's testimony that it was only performance issues that were the ostensible cause of Plaintiff's termination.

As Defendant has stated legitimate, nondiscriminatory reasons for Plaintiff's discharge, the burden shifts back to Plaintiff to demonstrate that those reasons were pretextual. Pretext can be shown by offering evidence that "(1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd*, 766 F.3d at 590 (quoting *Wexler*, 317 F.3d at 576). "When a defendant presents multiple legitimate, nondiscriminatory reasons for the employment action . . . the plaintiff must demonstrate that each independently sufficient reason is a pretext for illegal discrimination." *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 505 (6th Cir. 2011) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). Under Sixth Circuit precedent, the pretext stage of the analysis brings into play the "honest belief rule," which dictates that to counter plaintiff's evidence of pretext, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). The court in *Wright* elaborated:

> Even when the employer makes such a showing, "the protection afforded by the rule is not automatic.... [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'" . . . In determining whether an employer "reasonably relied on the

particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Although we will not "micro-manage the process used by employers in making their employment decisions," we also will not "blindly assume that an employer's description of its reasons is honest." Therefore, "[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held."

*Id.* (alterations in original) (internal citations omitted) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)).

Plaintiff's pretext argument essentially takes a three-pronged approach. Each line of argument is evaluated below to determine the extent to which, consistently with the pretext standard as articulated in *Loyd*, it raises a jury question over whether either of the two reasons furnished by Defendant: (1) was factually false, (2) did not actually motivate Defendant's decision, or (3) was insufficient to warrant termination. In the end, none of Plaintiff's arguments accomplishes this.

Plaintiff's first argument depends largely on a portion of her now-excluded Declaration, which she had characterized as a "rebuttal" to the performance issues raised by Defendant as grounds for her termination. (Pl.'s Resp. at 28, Pg ID 1008.) Absent the Declaration, the argument is now mostly without evidentiary support.

To the limited extent that the argument is independently supported by Plaintiff's deposition testimony and exhibits, the "rebuttal" falls short of establishing pretext when considered against the three elements of the *Loyd* test quoted above. Plaintiff does not appear to contend that the performance issues cited by Defendant did not occur; if anything, she has conceded that at least some of them did. (Bailey Dep. 83:6-84:18.) And there is little to no non-conjectural basis on which to conclude that those performance issues were so minimal that they collectively could not actually have been one of Defendant's subjective reasons for the decision. (Plaintiff does make a separate argument that Defendant's stated reasons were not the real reasons for her firing, and that is considered below.) Thus, neither of *Loyd*'s first two options makes for a plausible pretext argument based on Plaintiff's attempt to rebut Defendant's assessment of her performance, and so any "rebuttal" would have to be read as an argument that the cited performance issues were objectively insufficient to justify the decision. But Sixth Circuit case law (like that of other circuits) strongly urges judicial deference to business judgment in circumstances like this. *See, e.g., Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("As we have oft times repeated, 'it is inappropriate for the judiciary to substitute its judgment for that of management.'") (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)); *Covington v. MCI Worldcom Network Servs. Inc.*, 93 F. App'x 837, 840 (6th Cir. 2004) ([A] trial court does not

'sit as a super-personnel department" in Title VII cases to second-guess the wisdom of an employer's standards.") (quoting *Hedrick*, 355 F.3d at 462); *accord Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (internal quotation marks omitted) ("Put frankly, employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."), *cert. denied sub nom. Flowers v. Troup Cty., Georgia, Sch. Dist.*, 136 S. Ct. 2510, 195 L. Ed. 2d 840 (2016). All in all, Plaintiff has not shown that her performance issues taken together were so objectively negligible as to permit an inference that they were nothing more than pretext.

Second, Plaintiff maintains that inconsistencies between the accounts of Squire and Walker as to when and why they decided to terminate Plaintiff have created important fact issues that suggest pretext. The inconsistency as to "when" involves purported ambiguity from deposition testimony by Squire and Walker as to whether the decision was made prior to the March 2014 meeting or at it; the inconsistency as to "why" involves some testimony suggesting the decision was made based on poor performance and resume embellishment, and other testimony suggesting it was made based on Plaintiff's failure to properly account for her performance issues and resume embellishment when confronted with them. This could only implicate the second of the *Loyd* scenarios (that the proffered reason did

not actually motivate the decision), but the alleged inconsistencies are fanciful. The deposition testimony given by Squire and Walker that Plaintiff characterizes as contradictory in fact tells a wholly consistent story: before Plaintiff returned from maternity leave in March 2014, Squire and Walker decided to have a meeting with Plaintiff "that may end in termination," but did not at that moment decide conclusively to terminate Plaintiff because "the process requires feedback from the employee which [Squire and Walker] had not received." (Pl.'s Resp. Ex. E, Deposition of David Squire at 87:16-19.) When Squire and Walker then found Plaintiff's explanations at the meeting unsatisfactory, they decided to terminate her. (Squire Dep. 96:8-98:4; Walker Dep. 204:12-212:10.) In fact, this accounts not only for Plaintiff's alleged inconsistency as to when the decision was made, but also for Plaintiff's alleged inconsistency as to the reason for the decision: Plaintiff has not explained how (or provided legal authority suggesting that) a bad act and failure to properly explain oneself when challenged about that bad act are inconsistent as rationales for disciplinary action. Because Plaintiff has not demonstrated any contradiction within Squire's and Walker's accounts of Plaintiff's termination that shows them to be pretextual—or indeed any contradiction within those accounts at all—the Court rejects this argument.[8]

---

[8] Plaintiff supports the argument by citing *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519 (6th Cir. 1997), for the proposition that inconsistent managerial accounts of the reasons for an employee's firing create jury questions as to pretext. *Tinker* is

Plaintiff's third pretext argument is that Defendant violated or inconsistently applied its own internal policies in ways that suggest that Defendant's proffered reasons for terminating Plaintiff were pretextual. Specifically, Plaintiff argues that in terminating her, Defendant failed to abide by its own internal discipline policies, and acted inconsistently with its past practices with respect to terminating employees for resume falsification.

As to the first of these arguments, Plaintiff has failed to show any departure by Defendant from its own internal disciplinary policy—let alone a departure so clear as to imply that Defendant's proffered reason for terminating Plaintiff was subjectively false or objectively insufficient under *Loyd*. Plaintiff has submitted as exhibits several of Defendant's policy documents, and the policies set forth in them distinguish between major and minor infractions, as well as recommend progressive disciplinary measures—ranging from counseling to suspension to termination—based on the severity of an employee's infraction. (Pl.'s Resp. Ex. Y, Employee Work Rules/Discipline Policy; *see also* Pl.'s Resp. Ex. Z, Discipline Investigation Report & Corrective Action Forms.) Plaintiff argues that Defendant's failure to discipline Plaintiff under these policies renders its explanation for her

not on point. In that case, the inconsistency was clear and unambiguous: one manager claimed that he had decided to fire the plaintiff for an apparently honest (albeit substantial) mistake, while another manager testified that *he* had made the decision to fire the plaintiff for conspiring with two others to defraud the company. Plaintiff's asserted inconsistency between Walker's and Squire's accounts of the reasons for her discharge comes nowhere near this.

termination pretextual; Defendant counters that resume misrepresentations made by a senior human resources professional do not present the sort of disciplinary concern that can be remedied by counseling or other remedial discipline. Defendant's position is better supported by the evidence in several respects. For one, the Employee Work Rules that Plaintiff relies upon expressly provide: "The Work Rules listed are not intended to be all-inclusive. It should also be noted that levels of discipline may be adjusted based on severity of the incident." (Pl.'s Resp. Ex. Y at 3, Pg ID 1249.) These rules clearly give discretion to managers to tailor disciplinary proceedings and decisions to the gravity of the offense. Moreover, the Employee Work Rules specify various infractions of different degrees of severity (*see id.* at 2-12, Pg ID 1248-58; Pl.'s Resp. Ex. Z at 7, Pg ID 1478), and while these lists of infractions are presumably non-exhaustive just like the rest of the policy, the fact that there is no specific mention of resume falsification supports Defendant's argument that it is an issue egregious or fundamental enough to not fall within the normal disciplinary procedures.

Even if Plaintiff had shown that Defendant somehow failed to act in accordance with its own internal disciplinary policies, she has not provided the Court with legal authority establishing that such a failure on Defendant's part would raise a jury question over pretext. First, Plaintiff cites a handful of cases from other jurisdictions for the general proposition that an employer's failure to

abide by its own policies can in some circumstances support a finding of pretext, but she has provided no explanation as to why these cases weigh in favor of such a finding here. The Court finds these cases to be distinguishable as well as non-precedential. In *Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001), the Seventh Circuit found evidence of pretext where the policy used to terminate an employee was vague and undefined *and* the use of that particular policy as grounds for a termination was unprecedented. *See id.* at 888–91. Even if the first of those two factors was present here—and it is not clear that it is—the second is not, and the consistency of Plaintiff's termination with past practices is discussed below. Ruling on a retaliation case, the D.C. Circuit in *Jones v. Washington Metro. Area Transit Auth.*, 205 F.3d 428 (D.C. Cir. 2000), recognized the relevance of an employer's terminating an employee in clear violation of its own internal procedures, but actually found pretext based on that fact in conjunction with a substantial amount of additional pretext evidence, including evidence that the employer's proffered explanation was false, as well as evidence of past instances of unlawful retaliation by the employer. *See id.* at 434. Meanwhile, Plaintiff's other cases from outside the Sixth Circuit recite general propositions to the effect that an employer's violation of its own policies (or inconsistency with its own past practices) can help to show pretext, but then go on to find those propositions irrelevant to the cases before them. *See Greer v. Paulson*, 505 F.3d 1306, 1319–20

(D.C. Cir. 2007) (concluding that the plaintiff had failed to raise a jury question regarding pretext); *Green v. New Mexico*, 420 F.3d 1189, 1193–94 (10th Cir. 2005) (same). The relevance of *Greer* and *Green* to this case is just as unclear.

Plaintiff's cited Sixth Circuit cases are equally unavailing. The court in *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553 (6th Cir. 2009), cited by Plaintiff for the proposition that "an employer's inconsistent application or non-uniform interpretation of an ambiguous company policy can prove pretext" (Pl.'s Resp. at 29, Pg ID 1009), actually went on to conclude that the non-uniform application of its rules "alone, without other evidence of employer unreasonableness or dishonesty . . . does not suffice under our precedents to create a material dispute over whether [the employer's] proffered explanation was merely a pretext for an unlawful business practice." *Id.* at 561.

In the unpublished case *Lamer v Metaldyne Co*, 240 F. App'x 22 (6th Cir. 2007), characterized by plaintiff as holding that an "employer's failure to uniformly apply progressive discipline policy is proof of pretext," the Sixth Circuit held that evidence of inconsistent application of the policy actually used to terminate the plaintiff can support a finding of pretext. *See id.* at 11 ("Evidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext.") (citations omitted). *Lamer* may seem relevant to Plaintiff's assertion that none of the other employees

fired by Defendant in the past for resume falsification were fired for the "innocuous statement of the problems associated with job titles and dates occupying various job titles" that Plaintiff was fired for. (Pl.'s Resp. at 29, Pg ID 1009; Pl.'s Resp. Ex. EE, Schedule of Terminated Employees.) But the Court finds this characterization of the discrepancies between Plaintiff's 2011 and 2013 applications to be more than a little disingenuous. The "problems associated with job titles" involved changes between the resumes that substantially altered the amount of authority that the job title implied Plaintiff had, and the "problems associated with . . . dates occupying various job titles" involved discrepancies as to how long she served in a job that in some cases amounted to a year or longer. Plaintiff's argument that she was fired for far less than any other employee who had been fired for resume problems, and that Defendant thus applied its own policies so inconsistently in her case as to raise an inference of pretext, is meritless. This case comes to the Court at the summary judgment stage, not on a motion to dismiss where the Court must accept as true a plaintiff's allegations in the complaint. Whether Defendant's position succeeds at summary judgment depends on the facts provided in the pleadings, depositions, etc., which Defendant believes demonstrate the absence of a genuine issue of material fact, per *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), discussed at page 17, *supra*. Plaintiff, after discovery, did not set forth any specific examples (evidence) to support her

allegation that Defendant did not fire employees for resume discrepancies.

In addition, the Sixth Circuit has indicated that an employer's inconsistent application of its own policy cannot by itself support a finding of pretext. *See E.E.O.C. v. Lucent Techs. Inc.*, 226 F. App'x 587, 592 (6th Cir. 2007) ("[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext.") (quoting *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 246 (6th Cir. 2005); *Sybrandt*, 560 F.3d at 561; *see also Vandine v. Sys.*, 2016 WL 5661691, at *5 (S.D. Ohio 2016) ("[A]lthough failure to follow internal disciplinary procedures can be evidence that an employee's poor performance was not the real reason for her termination, not every technical failure to follow disciplinary protocol is necessarily evidence of pretext.") (quoting *Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 846–47 (6th Cir. 2015)).

In light of the above, the Court finds that although Plaintiff states a *prima facie* case for race discrimination under Title VII, § 1981, and the ELCRA, she is ultimately unable to rebut Defendant's justification for her termination, as pretext for an unlawful motive. Accordingly, the Court will grant summary judgment to Defendant on Plaintiff's race discrimination claims in Counts I, II, and VI.

### 2. Pregnancy Discrimination (Counts V and VIII)

Plaintiff's pregnancy discrimination claims are brought under Title VII and

the ELCRA. Like race discrimination claims, pregnancy discrimination claims under the ELCRA are analyzed "under the same framework as Title VII claims."[9] *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 487 n.2 (6th Cir. 2013) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003)). This means as a practical matter that Plaintiff's pregnancy discrimination claims are also to be evaluated under the *McDonnell Douglas* burden-shifting framework. *See Latowski*, 549 F. App'x at 483. To state a *prima facie* case for pregnancy discrimination, Plaintiff "must show that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Megivern v. Glacier Hills Inc.*, 519 F. App'x 385, 395 (6th Cir. 2013) (quoting *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006)).

Here again, there is no dispute about the "protected class" and "adverse employment decision" elements. Further, the issue of whether Plaintiff was qualified for her position is the same here as it is in the context of the race

---

[9] In the Title VII context, pregnancy discrimination is a form of prohibited sex discrimination. *See* 42 U.S.C. § 2000e-2(a)(1) (providing that it is an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex"); 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . .").

discrimination claim, and so for the same reasons as are discussed above, the Court finds that Plaintiff has created a triable issue of fact on that question.

Whether there was a "nexus" between Plaintiff's pregnancy and the termination of her employment is a separate question. The Sixth Circuit has recognized that such a nexus can be based on temporal proximity between an employer's learning of an employee's pregnancy and that employee's termination. *See Asmo*, 471 F.3d at 594 (holding that a period of approximately two months between an employer's learning of an employee's pregnancy and that employee's termination constituted sufficient temporal proximity to establish a causal nexus for the purposes of the plaintiff's *prima facie* case); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005) (same). This is not the only method of showing causation, though, and a plaintiff alleging pregnancy discrimination also "can prove the fourth element of the prima facie case through comparison to 'another employee who is similarly situated in her or his ability or inability to work [and] received more favorable benefits.'" *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir. 2013) (quoting *Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996)). The latter approach is clearly unavailing to Plaintiff here. She testified that Defendant increased her workload after she announced her pregnancy, but has provided no credible evidence that any increase in her workload was unique to her; in fact, she testified that she could not say whether Walker, the

only other department employee who engaged in recruiting work, also saw an increase in her own workload. (Bailey Dep. 22:1-17.) Moreover, this Court is not persuaded that temporal proximity—which in this case was just over seven months—is enough by itself to raise a fact issue as to a causal link between her pregnancy and her termination. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566–67 (6th Cir. 2000) (explaining in the similar context of a Title VII retaliation claim that typically, decisions that allow "a prima facie case to be made based on the proximity of time have all been [based on] short periods of time, usually less than six months").

Even assuming that there is a causal nexus demonstrated by temporal proximity, Defendant is nonetheless entitled to summary judgment on Plaintiff's pregnancy discrimination claims, since there is nothing about the pregnancy discrimination context that affects the pretext analysis set forth above. Specifically, Defendant has posited a valid, non-pretextual justification for Plaintiff's termination. For the same reasons as are discussed above in the context of Plaintiff's race discrimination claims, Plaintiff cannot show that Defendant's reasons for terminating her were pretextual as to her pregnancy discrimination claim. The Court will therefore grant summary judgment to Defendant on Plaintiff's pregnancy discrimination claims in Counts V and VIII.

### 3.    Age Discrimination (Count IX)

Plaintiff's age discrimination claim is brought under the ELCRA.[10] Like the race and pregnancy discrimination claims discussed above, plaintiffs who bring claims under the ELCRA have the same burdens of proof as they would if they were suing under ELCRA's federal analogue—in this instance, the Age Discrimination in Employment Act, 29 U.S.C. § 14 *et seq.* ("**ADEA**"). *See Maletich v. La-Z-Boy Inc.*, 2013 WL 3328302, at *9 (E.D. Mich. 2013) ("In light of the materially indistinguishable language used in the ADEA and ELCRA, both the Sixth Circuit and this Court have held that claims of age discrimination brought under the federal statute and Michigan statutes are analyzed under the same legal standards.") (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009)).

To establish a prima facie case of age discrimination under the ADEA (and therefore the ELCRA), a plaintiff must show that: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) after he

---

[10] Count IX of the Amended Complaint does not expressly identify its legal basis in the same way that other Counts do, but the Court construes it as an ELCRA claim. Plaintiff has not pled administrative exhaustion as required for an age discrimination claim under the Age Discrimination in Employment Act, 29 U.S.C. § 14 *et seq. See Spengler v. Worthington Cylinders*, 615 F.3d 481, 489 (6th Cir. 2010) (noting that an ADEA "plaintiff must file a charge with the [Equal Employment Opportunity Commission] before filing a complaint alleging age discrimination in federal court") Plaintiff also testified that her EEOC charge did not include age discrimination. (Am. Compl. at ¶ 3, Bailey Dep. 39:12-15.)

was rejected, a substantially younger applicant was selected." *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510–11 (6th Cir. 2004) (citing *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001)). "The fourth element may be satisfied 'by showing that similarly situated non-protected employees were treated more favorably.'" *Coomer*, 370 F.3d at 511 (quoting *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). "Once a *prima facie* case has been established, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination." *Kim v. Harvey*, 463 F. Supp. 2d 716, 726 (E.D. Mich. 2006) (internal citations omitted) (citing *McDonnell Douglas*, 411 U.S. at 802, 804), *aff'd*, 256 F. App'x 747 (6th Cir. 2007).

The analysis here mirrors that of Plaintiff's race discrimination claim. Defendant does not dispute that Plaintiff suffered an adverse employment action. Plaintiff testified that she was at least 40 years old at the relevant time. (Bailey Dep. 73:22-23.) Defendant does not dispute this. The third prong (Plaintiff's qualification for the position) is satisfied for the same reasons as set forth above, and since Hale was "very young" in addition to Caucasian (Bailey Dep. 71:24-72:3), the fourth prong (better treatment of a younger comparator) is satisfied too.

The pretext analysis here also parallels that of the race and pregnancy discrimination claims, though, and Plaintiff has not put forward any reason that it

should not fail, as well. The Court will therefore grant summary judgment to Defendant on Plaintiff's age discrimination claim in Count IX.

## B. Retaliation Claims (Counts III, IV, and VII)

In Counts III, IV, and VII of the Amended Complaint, Plaintiff asserts that owing to her termination, she was the victim of retaliation for protesting racially discriminatory hiring practices. Her retaliation claims are brought under 42 U.S.C. § 1981, Title VII, and the ELCRA respectively. As with the race discrimination claims, the *McDonnell Douglas* burden-shifting framework applies to each of these three claims. *See Wasek v. Arrow Energy Servs., Inc.,* 682 F.3d 463, 472 (6th Cir. 2012) (holding that ELCRA retaliation claims are analyzed in the same manner as their Title VII analogues); *Campbell v. Univ. of Akron*, 211 F. App'x 333, 350 (6th Cir. 2006) (holding that § 1981 retaliation claims analyzed in the same manner as Title VII retaliation claims) (quoting *Ford v. General Motors Corp.*, 305 F.3d 545, 552–53 (6th Cir. 2002)). Here, a plaintiff must show that "(1) [he or she] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Ford*, 305 F.3d at 553. "Once the plaintiff has established a *prima facie* case, the burden of production . . . shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. The

plaintiff, who bears the burden of persuasion throughout the entire process, must then demonstrate that the defendant's proffered reason was false." *Id.* (internal citations omitted). In the retaliation context, as a general principle, "[t]he burden of proving a prima facie case is not onerous, but one easily met." *Minevich v. Spectrum Health-Meier Heart Ctr.*, 1 F. Supp. 3d 790, 804 (W.D. Mich. 2014) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

There is no debate over whether Plaintiff suffered an adverse employment action. The informal complaints that Plaintiff alleges she made to Walker, moreover, fall within the definition of protected activity. "Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice[,]" and a demand that a supervisor cease his or her unlawful conduct "constitutes protected activity covered by Title VII." *Yazdian v. ConMed Endoscopic Techs.*, Inc., 793 F.3d 634, 645 (6th Cir. 2015) (internal citations omitted) (elaborating that Title VII does not "require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision"). Plaintiff testified that on several specific occasions, she complained to Walker about what she thought was racially discriminatory conduct; Walker denied ever having discussed the topic of race with Plaintiff. As ambiguities like this must be resolved in Plaintiff's favor at this stage, the Court concludes that Plaintiff has raised jury questions on the first and second elements of protected activity and employer knowledge thereof.

Plaintiff advances similar causation arguments in support of her retaliation claim as she made regarding her pregnancy discrimination claim. Plaintiff's causation argument based on her assertion that "Defendant created an unmanageable workload" after she began complaining to Walker (*see* Pl.'s Resp. at 27, Pg ID 1007) is unpersuasive for the same reason that the Court rejected a similar argument in the context of Plaintiff's pregnancy discrimination claim: there is no evidence that Plaintiff was given a heavier workload than any other employee. Plaintiff began complaining to Walker about discrimination sometime in July of 2013 (Bailey Dep. 12:2-13), but had also emailed Walker the previous month stating that she "may be getting caught up" and could take on more work if desired. (Def.'s Mot. Ex. 37.) This potential alternative explanation undermines any inference that the alleged increased workload was a punitive act.

Plaintiff's retaliation claim must fail, on the pretext discussion, here, as well. Plaintiff's failure to rebut Defendant's stated nondiscriminatory and nonretaliatory reasons for her termination defeats her retaliation claims just as it does her discrimination claims. Accordingly, the Court will grant summary judgment to Defendant on Plaintiff's retaliation claims in Counts III, IV, and VII.

## IV.      CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendant Oakwood Healthcare, Inc.'s Motion for Summary Judgment.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: August 23, 2017

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 23, 2017.

s/D. Tofil
Deborah Tofil, Case Manager
